MOBIL OIL CORPORATION, a New York Corporation, Plaintiff,

v.

Claude KELLEY, Director of the Department of Conservation, and Department of Conservation, State of Alabama, et al., Defendants.

Civ. A. No. 7277-72-P.

United States District Court,
S. D. Alabama, S. D.

Dec. 22, 1976.

W. Dewitt Reams, James D. Brooks, Mobile, Ala., Roy M. Talley, New Orleans, La., for plaintiff.

William J. Baxley, Atty. Gen., George L. Beck, Deputy Atty. Gen., Montgomery, Ala., for defendants.

William T. Watson, Asst. Atty. Gen., University, Ala., for State Oil and Gas Bd.

## ORDER ON DEFENDANTS' OBJECTIONS TO PLAINTIFF'S AMENDED COMPLAINT

PITTMAN, Chief Judge.

Mobil Oil Corporation (Mobil) is a New York Corporation with its principal place of business located in New York. It is qualified to do business in the State of Alabama.

The defendants, Claude Kelley and William J. Baxley, are each over the age of 21 years, and citizens of the State of Alabama. Mr. Kelley is the Director of the Department of Conservation (Conservation) for the State of Alabama (Alabama). Mr. Baxley is the chief legal officer for the State of Alabama, the Attorney General.

In September, 1969, the Alabama Conservation Director advertised for bids on leases on approximately 20,000 acres of water bottom property in Mobile Bay. Mobil, the highest bidder, was granted the leases on October 24, 1969. Separate leases were awarded on each of the four tracts involved in this litigation. Each of the leases was duly executed by the Conservation Director, approved by the Governor of Alabama, and attested by the Secretary of State, all as required by Alabama statutory law.

Each lease was for a five (5) year term and as long thereafter as there was production of oil or gas from that lease. The leases provided that even though oil or gas has been discovered on the leased premises, Lessee cannot have more than two (2) years after the end of the primary term within which to complete the drilling of other wells on that lease. Any part of the leased premises which is not included in an oil or gas well unit which is producing at the end of the period is freed of the lease and the Lessee is permitted to retain under the lease only the part of the leased premises which are in producing oil or gas units.

Mobil paid 78,822 dollars as lease bonuses for the four (4) leases and paid, on or before October 24th of 1970 and of 1971, 19,695 dollars as delay rentals for each year as required by the terms of the leases. Mobile has also spent in excess of $139,000.00 in evaluating the land covered by the leases as well as considerable inter-company time and expenses.

The leases specifically granted to Mobil the right to drill on the property covered by the leases during the term of the leases.

On July 9, 1970, Mobil filed an application with the State Oil and Gas Board of Alabama for a permit to drill a well at a location in Mobile Bay covered by one of the four leases. Up until the time of the filing of that application, permits had been issued routinely by the Board when the applicant qualified under the rules and regulations. At least two wells had previously been permitted and drilled in Mobile Bay prior to Mobil having made its application. Mobil's application was not questioned.

Mobil requested a drilling permit from the U.S. Corps of Engineers (Corps) as required by Federal law, on July 17, 1970. A permit was not issued by the Corps.

Mobil requested the defendant Kelley, as the Director of Conservation, to grant extensions on the leases but was informed that he had no authority to do so.

The original complaint was filed on August 9, 1972, by Mobil as lessee from the State of Alabama of the oil and gas rights, seeking declaratory and injunctive relief. The named defendants were the Alabama Department of Conservation and its Director, Claude Kelley in his official capacity, the State Oil and Gas Board and its members in their official capacities, the State Oil and Gas Board Supervisor, Philip E. LaMoreaux, in his official capacity, and the Attorney General for the State of Alabama, William J. Baxley, in his official capacity.

In the original complaint Mobil sought to have the court to extend the period of its lease with the State and enjoin the defendants from failing to issue, or interfering with the issuance of a valid drilling permit for the leased lands. Jurisdiction was based on 28 U.S.C. § 1331, 28 U.S.C. § 1332, and Amendment Fourteen, Section 1, United States Constitution.

This court entertained jurisdiction of the cause and on January 11, 1973, entered the following order, to wit:

"It is therefore, ORDERED, ADJUDGED, and DECREED, that the leases, to wit, numbers 347, 348, 349, and 350, and the obligations and payments due thereunder should be, and from this date are hereby STAYED until three (3) years and seventy-six (76) days after the Oil and Gas Board has issued a valid drilling permit.

"It is further ORDERED, ADJUDGED, and DECREED that the terms of the leases, to wit, numbers 347, 348, 349, and 350, are extended by staying the running of the primary terms set out in each lease from August 9, 1970, until the date the Oil and Gas Board issues a valid drilling

permit and an additional two (2) years after the primary term if there is drilling. "The court retains jurisdiction of this cause and on petition of any party or by the court *ex mero motu* this cause may be set down for another hearing to fashion other and different relief in order to do justice between the parties according to law and equity."

The ruling was appealed to the Fifth Circuit and, by its opinion of May 6, 1974, was affirmed.

In 1973, Mobil amended its request to the Corps for a permit to drill by limiting its application to a permit to drill a test well which would be capped some fifteen feet below the Bay bottom after the testing had been completed, regardless of whether the test indicated there could be oil or gas produced from the well. Mobil's amended application recognized that a new and additional application would be required before Mobil could be permitted to drill and operate any producing wells, regardless of what the outcome of the test well was.

Under Alabama law, *Code of Alabama* (1940 Recomp.1958), Title 22, Section 140(12g), the Alabama Water Improvement Commission (A.W.I.C.) is designated the State water pollution control agency for this State for all purposes of the Federal Water Pollution Control Act. On, to wit, July 17, 1970, and again on October 29, 1973, Mobile requested A.W.I.C. to issue certification as provided in the Federal Water Pollution Control Act.

The Corps, on October 28, 1975, held a public hearing in Mobile, Alabama, jointly with A.W.I.C. concerning Mobil's application for a drilling permit. Mobil's application to drill a test well was taken under advisement by the Corps with the advice it was necessary that it either have certification from A.W.I.C. or a Disclaimer by A.W.I.C. before it could act favorably on Mobile's application.

On December 8, 1975, the A.W.I.C. certified Mobil's application to drill to the Corps. On February 2, 1976, A.W.I.C. rescinded its earlier action granting the certification and took the matter under consideration. On March 28, 1976, the A.W.I.C. formally revoked its certification and adopted a resolution denying Mobil's application for certification. Mobil formally requested a hearing before A.W.I.C. This hearing was granted and on April 28, 1976, Mobil presented testimony in support of its application for certification. On May 28, 1976, the A.W.I.C. formally adopted a resolution ratifying its former action in denying the application.

The Gas Board has advised the Corps that it is ready to act on Mobil's application to drill as soon as the Corps has acted on Mobil's application to the Corps.

On June 30, 1976, Mobil filed in this cause a motion for leave to file an amended complaint. The amended complaint added the following party defendants, to wit: Gaines McCorquodale, Member, State Oil and Gas Board, State of Alabama Water Improvement Commission; Mr. Ira Myers, Chairman, A.W.I.C.; Dr. Robert Bucher, Member, A.W.I.C.; Marvin O. Berglin, Member, A.W.I.C.; Charles O. Cargile, Member, A.W.I.C.; Louis Grabensteder, Member, A.W.I.C.; and James W. Warr, Chief Administrative Officer, A.W.I.C.

Jurisdiction is based on Section 1 of the Fourteenth Amendment to the United States Constitution, and Title 28, U.S.C. Sections 1331 and 1332. The $10,000 jurisdictional amount is alleged.

The amended complaint seeks preliminary and permanent injunctions restraining and enjoining the defendants A.W.I.C., its individual members, agents, servants, successors and assigns from failing and refusing to grant the certification needed by Mobil to obtain a permit from the U.S. Corps of Engineers to drill wells on the property covered by the leases.

A hearing was held on the motion to amend and motion for a preliminary injunction. Upon due consideration of the pleadings, briefs, and arguments, it is the opinion of this court that the respective motions should be denied.

The pervasive control over the introduction of pollutants into the waters of

this State is vested in the Alabama Water Improvement Commission by the *Code of Alabama* (1940 Recomp.1958), Title 22, § 140(3). This control is subject only to the paramount right of the United States to control and regulate the use thereof in the exercise of its power under the commerce clause of the Constitution. *Beaunit Corporation v. Alabama Power Company,* 370 F.Supp. 1044 (N.D.Ala.1973). The Federal Water Pollution Control Act Amendments (FWPCA) of 1972 prohibit the discharge of a pollutant by any person unless permitted otherwise in the Act, and reach all waters of the United States in the geographic sense in order to control pollution at its source. *U. S. v. Holland,* 373 F.Supp. 665 (M.D.Fla.1974). A reading of the Act itself, along with its legislative history, exhibits a strong legislative preference that the certification process be reviewable in the State courts.

■ Looking first at the Act itself, the purpose and policy of it is set out in 33 U.S.C. § 1251, which states in pertinent part:

"(b) It is the policy of the Congress to recognize, preserve, and protect the primary responsibilities and rights of States to prevent, reduce, and eliminate pollution, to plan the development and use (including restoration, preservation, and enhancement) of land and water resources. . . . "

With this purpose in mind Congress included legislation that allows the states to play a major part in the fight against pollution by requiring potential polluters to obtain permits from qualified states before entering into the requested activity. Section 401(a)(1) the Act, 33 U.S.C. § 1341, provides in part that:

"Any applicant for a Federal license or permit to conduct any activity including, but not limited to, the construction or operation of facilities, which may result in any discharge into the navigable waters, shall provide the licensing or permitting agency a certification from the State in which the discharge originates or will originate . . . that any such discharge will comply with applicable provisions of Sections 301, 302, 306 and 307 of this Act. . . . Such State . . . shall establish procedures for public notice in the case of all applications for certification by it and, to the extent it deems appropriate, procedures for public hearings in connection with specific applications. . . . No license or permit shall be granted if certification has been denied by the State, interstate agency, or the Administrator, as the case may be."

As noted above, one of the sections upon which the State must base its grant or denial of certification is Section 301. Section 301(b)(1)(C) effectively incorporates into federal law all state water quality standards, schedules of compliance, law or regulations which are more stringent than otherwise provided by federal law.

Section 401(d) allows the State to condition any grant of certification upon compliance with any requirement the state agency deems to be appropriate under State law.

Section 510 of the FWPCAA, 33 U.S.C.A., § 1370, guarantees the right of the states to adopt and enforce within the limits of state authority any water pollution control requirement which is as stringent as or more stringent than federal requirements.

Section 511 of the FWPCAA, 33 U.S.C.A., § 1371, and specifically Section 511(c)(2) prohibits any federal agency from using the National Environmental Policy Act of 1969 as a means for reviewing the adequacy of any state certification under Section 401. It therefore follows that certification under Section 401 is set up as an exclusive perogative of the state and is not to be reviewed by EPA or any agency of the federal government.

A review of the legislative history of the FWPCAA reinforces the plain meaning of the Act itself to the effect that Congress intended the states to play a paramount role in the certification of potential polluters.

As stated in the history of the Act, the underlying principle of the Federal legisla-

tion in the field of water pollution has been that "The States shall lead the national effort to prevent, control and abate water pollution. As a corollary, the Federal role has been limited to support of, and assistance to, the States." U.S.Code Cong. and Admin.News, p. 3669 (92nd Cong., 1972). Primary responsibility for enforcement of state standards is vested in the states. U.S. Code Cong. and Admin.News, *supra,* at 3672.

In commenting on the certification provision—Section 401—it is stated:

" . . . [t]he provision makes clear that any water quality requirements established under state law, more stringent than those requirements established under this Act, also shall through certification become conditions on any Federal license or permit. The purpose of the certification mechanism provided in this law is to assure that Federal licensing or permitting agencies cannot override state water quality requirements.

"It should also be noted that the Committee continues the authority of the State . . . to act to deny a permit and thereby prevent a Federal license or permit from issuing to a discharge source within such State . . .. Should such an affirmative denial occur no license or permit could be issued by such Federal agencies as the . . . Corps of Engineers *unless the State action was overturned in the appropriate courts of jurisdiction."* [Emphasis added]. U.S.Code Cong. and Admin.News, *supra,* at 3735.

Since EPA was not intended to exercise any review over State action on certification and since no other federal agency may exercise such review under the National Environmental Policy Act, it follows that the proper forum for judicial review of state certification is in state court. In *Power Authority of New York v. Department of Environmental Conservation,* 379 F.Supp. 243 (N.D.N.Y.1974), the certifying agency of the State of New York had been sued by an electric utility which sought to enjoin the agency from conducting hearings with respect to a certification request of the utility. The court granted the state's motion to dismiss primarily on the basis that the case was not ripe for adjudication, but the court added therein the following:

"To my mind, and to be frank, the State Courts of New York are a far more appropriate forum for the plaintiff to challenge the scope of the hearings on its two contentions of the immunity conferred by the New York State Legislature in the Power Authority Act and the law of authority conferred by the FWPCAA of 1972. [citation omitted] I am conscious of the principle that federal courts must give due respect to suitor's choice of a federal forum for hearing and decision of federal constitutional claims, even though the state courts have the same solemn responsibility as the federal courts. [citation omitted]. But I firmly believe it should also be kept in mind that, as Justice Black said, we have had from the beginning two separate and independent legal systems that end up with the same right of ultimate review in the United States Supreme Court. [citation omitted]. The steady recourse to the federal courts for many problems, particularly on federal questions that the state courts could just as quickly and effectively process, has become a matter of serious concern. [citation omitted.]" *Power Authority, supra,* 379 F.Supp. at 248–249.

In view of the plain meaning of the FWPCAA and its legislative history, this court is of the opinion that state courts of Alabama would be the proper forum for the petitioners to air their grievances. The abstention doctrine stands for the principle that parties seeking initial relief in a federal district court and by-passing available avenues of state relief should be directed to state avenues when the questions involved concern the workings of a state regulatory scheme, state political question, or the interpretation of state agency orders under state law. In *Burford v. Sun Oil,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), Sun Oil had appealed to a federal district court the decision of the Texas Railroad Commission (which supervised the oil and gas in-

dustry), to allow Burford to drill four wells on a closer than normal spacing. Sun Oil had invoked diversity and due process considerations to get before the federal district court. There, the court said:

"These questions of regulation of the industry by the State Administrative Agency whether involving gas or oil prorating programs or Rule 37 case [well spacing] so clearly involve basic problems of Texas policy that equitable discretion should be exercised to give Texas courts the first opportunity to consider them." 319 U.S. 315, 333, 63 S.Ct. 1098, 1106, 87 L.Ed. 1424.

" . . . The overall plan of regulation, as well as each of its cases by case manifestations is of vital interest to the general public. . . . The Commission in applying the statutory standards of course considers the Rule 37 cases as a part of the entire conservation program [of oil] with implications to the whole economy of the state." *Sun Oil,* supra, at 324, 63 S.Ct. at 1102.

■ The water pollution program as administered by the A.W.I.C. is complex and requires expertise in the field of water pollution, as well as a knowledge of those local factors which should and are weighed in reaching a final determination. This court is of the opinion that "[a]s adequate State Court review of an administrative order based upon predominantly local factors is available to appellee, intervention of a federal court is not necessary for the protection of federal rights." *Alabama Public Service Commission v. Southern Railroad Company,* (1951) 341 U.S. 341, 349, 71 S.Ct. 762, 768, 95 L.Ed. 1002, at 1008–1009. In an effort to maintain harmonious federal-state relations of a matter close to the political interests of the State of Alabama and being comprised of purely local factors over which the A.W.I.C. is better suited to handle, this court feels that the ample state court remedies available to petitioner make this cause a proper one for this court to abstain from recognizing jurisdiction herein.

It is therefore ORDERED, ADJUDGED, and DECREED that the motion to amend and the motion for a preliminary injunction are due to be and hereby are DENIED.

All costs are taxed to the plaintiff.