**MINERS ADVOCACY COUNCIL, INC., Appellant,**

v.

**STATE of Alaska, DEPARTMENT OF ENVIRONMENTAL CONSERVATION; Trustees for Alaska; and Northern Alaska Environmental Center, Appellees.**

**TRUSTEES FOR ALASKA and Northern Alaska Environmental Center, Appellants,**

v.

**STATE of Alaska, DEPARTMENT OF ENVIRONMENTAL CONSERVATION; Dennis D. Kelso, Commissioner of the Department of Environmental Conservation; and Miners Advocacy Council, Inc., Appellees.**

**Nos. S–2369, S–2370.**

Supreme Court of Alaska.

July 28, 1989.

Rehearing Denied Sept. 18, 1989.

William R. Satterberg, Jr., Fairbanks, for Miners Advocacy Council, Inc.

Patti J. Saunders, Anchorage, and Robert W. Adler, Washington, D.C., for Trustees for Alaska and Northern Alaska Environmental Center.

John A. McDonagh, Asst. Atty. Gen., Fairbanks, Grace Berg Schaible, Atty. Gen., Juneau, for State, Dept. of Environmental Conservation, and Dennis D. Kelso.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

RABINOWITZ, Justice.

These consolidated appeals raise procedural as well as substantive challenges to the Alaska Department of Environmental Conservation's (DEC) certification of National Pollution Discharge Elimination System (NPDES) permits issued to placer gold miners in Alaska by the United States Environmental Protection Agency (EPA).

I. BACKGROUND AND PRIOR PROCEEDINGS.

To comply with the federal Clean Water Act,[1] a person wishing to discharge pollutants into waters of the United States must secure an NPDES permit from EPA.[2] EPA may not issue an NPDES permit unless the resulting discharge will comply with state water quality standards. 33 U.S.C. §§ 1311(b)(1)(C), 1342. Before EPA may issue a permit, it must also provide the state in which the discharge originates with an opportunity to review the draft NPDES permit to determine whether the permit's terms ensure compliance with the state's water quality standards. 33 U.S.C. § 1341(a), (d). A state then has three options. It may deny certification of the NPDES permit, thereby precluding EPA from issuing the permit. 33 U.S.C. § 1341(a)(1). The state may waive certification, thereby removing itself from the permitting process. *Id.* Finally, the state may certify the draft permit, and may include in its certification any conditions more stringent than those in the draft permit which the state determines are necessary to comply with state or federal water quality standards. 33 U.S.C. § 1341(a)(2). EPA must incorporate more stringent conditions suggested by a state into the final NPDES permit. *Id.*

In 1985, EPA notified the State of Alaska that EPA intended to modify 446 existing NPDES permits issued to placer gold miners, and to issue 93 new permits for placer mining operations in the state. The EPA notices clearly specified that the agency was proposing to issue 539 individual NPDES permits. However, EPA did not prepare and send to the state 446 draft permits and 93 new draft permits. Instead, EPA sent DEC one draft NPDES permit to review because EPA intended to grant 539 identical individual permits.[3] The model draft permit proposed by EPA contained a settleable solids[4] effluent limit[5] of 1.5 milliliters per liter (ml/l) as an instantaneous maximum and 0.7 ml/l monthly average. Since EPA planned to grant identical NPDES permits to every placer miner who applied for a permit, these settleable solids standards would have applied to each applicant.

1. The statute commonly referred to as the Clean Water Act was originally enacted as the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, § 2, 86 Stat. 816 (codified as amended at 33 U.S.C. §§ 1251–1387).

2. The Clean Water Act prohibits the discharge of any pollutant. 33 U.S.C. § 1311(a). Notwithstanding this prohibition, EPA may issue permits to discharge pollutants if the applicant meets certain specified conditions. *See* 33 U.S.C. § 1342.

3. EPA eventually issued 539 individual NPDES permits identical in all respects except for more lenient turbidity limits contained in 72 permits, based on site-specific information EPA received from individual miners.

4. Introduction of settleable solids into streams occurs when placer miners remove and process overburden in order to reach gold-bearing gravels. When fine sediment settles to stream bottoms, it can adversely affect fish spawning areas, alter water chemistry, and generally reduce the biological productivity of the streams. High sediment loads can also adversely affect streams' value for recreational and subsistence uses. A 1984 report issued by DEC termed pollution from placer mining "the largest environmental pollution problem in Alaska today." Alaska Dep't of Envtl. Conservation (Div. of Envtl. Quality, Water Quality Mgmt. Section), *Water Management in Alaska: 1984 Update* 12 (June 1984).

5. An effluent limit sets maximum limits for pollutant concentrations in discharges from mining operations. Pollutant concentrations may be diluted when waste water from mining operations enters a stream.

The agency charged with carrying out the NPDES certification process for the State of Alaska, DEC, also treated the 539 draft permits for placer mines as a group. Federal regulations require a state certifying agency to include in its certification of a draft NPDES permit "[a] statement that there is a reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3). When it certified the draft NPDES permits, DEC provided EPA with one such statement applicable to all 539 permits. However, DEC conditioned its blanket certification on adoption of a more stringent settleable solids standard of 0.2 ml/l, which DEC determined was necessary to ensure that placer mining operations could meet state water quality standards. The Alaska water quality standard for settleable solids is "[n]o increase in concentrations of sediment, including settleable solids, above natural conditions." 18 AAC 70.020. DEC interprets this standard to mean no measurable increase above natural conditions. Since standard measuring techniques can detect settleable solids concentrations down to approximately 0.1 ml/l, a concentration above the natural level of almost all Alaskan streams, DEC interprets 0.1 ml/l as the state water quality standard

for settleable solids. Appellants do not challenge this interpretation.

■ Given the fact that DEC issued one certification and statement of reasonable assurance applicable to all 539 draft permits, the 0.2 ml/l limit for settleable solids applied to every draft permit. In accordance with the requirements of the Clean Water Act, EPA incorporated this limit into the final individual NPDES permits the agency issued to Alaskan placer miners. After EPA issued the final permits, a number of parties, including the parties to this appeal and several individual miners, filed timely requests for an administrative adjudication of DEC's certification of the draft NPDES permits pursuant to 18 AAC 15.-200.[6] These requests were granted and the matters consolidated. In addition, Miners Advocacy Council, Inc. (MAC), filed suit against DEC in superior court challenging the certification. Trustees for Alaska (TFA) and Northern Alaska Environmental Center (NAEC) intervened in the suit. The superior court continued its proceedings and retained jurisdiction pending a ruling by the DEC Deciding Officer. After an adjudicatory hearing, the Deciding Officer upheld DEC's certification. TFA, NAEC, and MAC appealed this decision to the superior court, which affirmed the Deciding Officer's conclusions. These consolidated appeals followed.[7]

---

**6.** This section of the Alaska Administrative Code allows any person to request an adjudicatory hearing pertaining to DEC decisions concerning NPDES certifications, as well as other decisions on water quality related permits and variances.

**7.** Federal regulations implementing the Clean Water Act require EPA to issue NPDES permits for a fixed time period not to exceed five years. 40 C.F.R. § 122.46(a). The 539 NPDES permits at issue in this case, which EPA issued in 1985, expired on December 31, 1986.

In 1986, EPA issued an additional 104 NPDES permits to placer miners. These permits also expired on December 31, 1986. DEC certified these permits as a group, just as it did with the permits involved in the instant litigation. The permits issued in 1986 differed in one significant respect from those issued in 1985. When EPA submitted the 1985 permits in draft form to DEC for certification, the permits contained a settleable solids effluent limit of 1.5 ml/l as an instantaneous maximum and 0.7 ml/l as a monthly average. EPA reduced this limit to 0.2 ml/l in the final permits because DEC made the

reduction a condition of its certification. However, when EPA sent draft permits to DEC for certification in 1986, the permits already contained a settleable solids effluent limit of 0.2 ml/l. DEC therefore certified the permits without conditioning its certification on adoption of more stringent limits on settleable solids.

In 1987 and 1988, EPA issued a total of 367 NPDES permits to placer miners in three separate groups. These permits all expired on December 31, 1988. Like the 1986 permits, those issued in 1987 and 1988 already contained a 0.2 ml/l effluent limit on settleable solids when EPA sent the permits in draft form to DEC for certification. DEC certified the three groups of permits with three blanket certifications.

Under the series of events described above, we are of the view that the primary issue raised in this appeal by TFA and NAEC is not moot. These appellants argue that DEC's certification of the disputed NPDES permits was unlawful because the 0.2 ml/l settleable solids effluent limit contained within the permits does not ensure compliance with Alaska water quality stan-

## II. MAY DEC CERTIFY DRAFT NPDES PERMITS FOR PLACER MINES AS A GROUP RATHER THAN INDIVIDUALLY?

We must first decide whether DEC may certify all 539 draft NPDES permits for placer mining activities as a group rather than on a case-by-case basis. DEC readily admits that it neither performed site-specific evaluations nor considered information contained in individual NPDES permit applications[8] in its certification process. DEC argues that case-by-case certification of all 539 placer mining NPDES permits is economically and administratively infeasible, and would provide less assurance of compliance with state water quality standards than the agency's group certification approach. TFA and NAEC concede that the state's blanket certification is valid as long as it ensures that no individual permit holder will violate state water quality standards.[9] MAC, on the other hand, contends that both federal law and DEC regulations require site-specific certification on a case-by-case basis. In a related claim, MAC argues that DEC's group certification is invalid because the 0.2 ml/1 settleable solids effluent limit incorporated into every NPDES permit as a result of the certification constitutes a regulation which was not adopted according to the requirements of Alaska's Administrative Procedure Act.

At the administrative adjudication hearing, the DEC Deciding Officer expressly refused to decide whether DEC's group certification was "correct in its approach." The superior court, however, held that "[i]n light of economic and practical considerations, there is a reasonable basis to have a blanket certification for all 539 permits since any interested party may come in on a site-by-site basis and request a review." Both the Deciding Officer and the superior court concluded that DEC's imposition of the 0.2 ml/1 settleable solids effluent limit on all NPDES permit applicants by means of the agency's blanket certification did not constitute a regulation.

We must first determine what standard of review to apply to this question. While DEC's knowledge and experience may be important factors in deciding as a practical matter whether to carry out NPDES permit certifications on a group or site-specific basis, the agency's expertise is irrelevant to the question of whether blanket certification is legally permissible. Whether the federal Clean Water Act and DEC regulations require the state to certify NPDES permits on an individual, site-specific basis or allow the state to issue a blanket certification covering many individual permits without performing site-specific evaluations is a question of law, which this court reviews under the "substitution

---

8. In a hearing before the Deciding Officer, DEC Water Quality Section Chief Randolph Bayliss admitted that, to his knowledge, DEC did not review information provided by individual applicants "during the certification period for [the] purpose of certification." DEC maintains that virtually all information submitted by individual miners applying for NPDES permits is insufficient and unreliable, and is therefore useless.

9. In their brief, TFA and NAEC state the following:

Nor is DEC prohibited from issuing a blanket, statewide certification, based on considerations of administrative feasibility, as long as the result is compliance with water quality standards at *all* locations, which would require an effluent limit of 0.1 ml/1 for settleable solids. [Emphasis in original.]

This concession vitiates TFA and NAEC's argument that DEC is required by law to certify NPDES permits on a case-by-case basis.

---

dards. Since DEC has continued to certify NPDES permits containing a 0.2 ml/1 settleable solids effluent limit, whether this limit ensures compliance with state standards remains an issue in controversy. It is irrelevant whether the 0.2 ml/1 limit was set by DEC, as occurred with the 1985 permits, or whether EPA set the limit, as has happened since 1985. Regardless of which agency actually sets the final effluent limit, both federal and DEC regulations require that DEC certify only those draft NPDES permits which ensure that the permitted activities will not violate state water quality standards. Federal regulations require a state to include with its certification a statement that there is reasonable assurance that the permitted activity will not violate state water quality standards. 40 C.F.R. § 121.2(a)(3). DEC regulations, which prohibit activities which would violate state water quality standards, implicitly require DEC to certify only those permits which insure compliance with state standards. *See* 18 AAC 70.010.

of judgment" standard. *See Earth Resources Co. of Alaska v. State, Dep't of Revenue*, 665 P.2d 960, 965 (Alaska 1983) (citing *Kelly v. Zamarello*, 486 P.2d 906, 916 (Alaska 1971)).

■ This brings us to consideration of MAC's contention that federal law requires DEC to certify NPDES permits individually using site-specific information. The Clean Water Act itself is silent as to this issue. The federal statute simply provides that "any applicant" for a permit must obtain certification from the state in which the discharge originates or will originate that, *inter alia*, the discharge will comply with state water quality standards. *See* 33 U.S.C. §§ 1313, 1341(a)(1). The Act also requires that state certifications "set forth [conditions] ... and monitoring requirements necessary to assure that any applicant for a Federal license or permit will comply with any applicable effluent limitations and other limitations." 33 U.S.C. § 1341(d). While these provisions unambiguously require states certifying draft permits to provide assurance that every NPDES permit applicant will meet state water quality standards, they do not preclude certification of several permits as a group.

Similarly, federal regulations implementing the Clean Water Act do not specifically address whether states may issue one blanket certification for a number of NPDES permits. Regulations governing state certification of federal licenses and permits to conduct any activity which may result in discharges into waters of the United States require state certifications to include the following:

A statement that the certifying agency has either (i) examined the application made by the applicant to the licensing or permitting agency (specifically identifying the number or code affixed to such application) and bases its certification upon an evaluation of the information contained in such application which is relevant to water quality considerations, or (ii) examined other information furnished by the applicant sufficient to permit the certifying agency to make the statement [of reasonable assurance of compliance with state standards] described in paragraph (a)(3) of this section.

40 C.F.R. § 121.2(a)(2). Additionally, regulations dealing specifically with state certification of NPDES permits require such certifications to be in writing and include:

(1) Conditions which are necessary to assure compliance with the applicable provisions of CWA [Clean Water Act] sections 208(e), 301, 302, 303, 306, and 307 and with appropriate requirements of State law;

(2) When the State certifies a draft permit instead of a permit application, any conditions more stringent than those in the draft permit which the State finds necessary to meet the requirements listed in paragraph (e)(1) of this section. For each more stringent condition, the certifying State agency shall cite the CWA or State law references upon which that condition is based. Failure to provide such a citation waives the right to certify with respect to that condition; and

(3) A statement of the extent to which each condition of the draft permit can be made less stringent without violating the requirements of State law, including water quality standards. Failure to provide this statement for any condition waives the right to certify or object to any less stringent condition which may be established during the EPA permit issuance process.

40 C.F.R. § 124.53(e). These provisions, particularly the requirements of 40 C.F.R. § 121.2(a)(2), indicate that site-specific matters may be important considerations in the certification process. However, we do not believe that the federal regulations implementing the Clean Water Act can be read to require states to certify draft NPDES permits on a case-by-case basis. Like the statute itself, the primary thrust of the regulations appears to be to ensure that states certify only those draft permits which provide assurance that individual permittees will comply with state water quality standards. Beyond that, the federal regulations are virtually silent as to

what procedures states should employ in certifying draft NPDES permits.

Regulations promulgated by DEC governing its NPDES permit certification procedure also do not specifically address whether the agency must consider each draft NPDES permit separately. The regulations (i) simply require NPDES permit applicants to furnish the agency with copies of applications and supplementary information which applicants must submit to EPA, and (ii) authorize DEC to request further information.[10]

No reported cases have considered whether states must certify NPDES permits on an individual rather than a group basis, although a federal district court has noted in dictum that "effluent limitations are established by individual examination of the waterway." *Homestake Mining Co. v. United States Envtl. Protection Agency*, 477 F.Supp. 1279, 1286 (D.S.D.1979) (court paraphrasing an EPA General Counsel's decision).

In the absence of any statutory or regulatory requirement that DEC certify draft NPDES permits on an individual basis, we conclude that DEC may issue a blanket certification for draft NPDES permits covering a number of permittees, provided the certification ensures that Alaska water quality standards will be met.[11] The legis-

lative history of the Clean Water Act, which reveals that Congress intended to give states broad power and discretion in the fight against water pollution, bolsters the conclusion that states have discretion to certify NPDES permits on a group basis if they choose to do so. For example, the Senate Report accompanying the 1972 amendments to the Clean Water Act provides that "[t]he States shall lead the national effort to prevent, control and abate water pollution. As a corollary, the Federal role has been limited to support of, and assistance to, the States." S.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Admin.News 3668, 3669. Specifically discussing the NPDES certification process, the federal district court in *Mobil Oil Corp. v. Kelley*, 426 F.Supp. 230 (S.D.Ala.1976), noted:

> A review of the legislative history of the [Clean Water Act] reinforces the plain meaning of the Act itself to the effect that Congress intended the states to play a paramount role in the certification of potential polluters.

*Id.* at 234. Additionally, the Clean Water Act and its implementing regulations' lack of specific requirements governing states' NPDES certification procedures provides further evidence that Congress and the fed-

---

**10.** Department of Environmental Conservation regulations provide:

*NPDES CERTIFICATION PROCEDURE.* (a) Contemporaneous with the filing of an application for an NPDES permit, or for a modification or reissuance of an NPDES permit, with EPA, a copy of the application and all supporting information, together with a cover letter requesting certification, must be served on the central office of the department. If the certification request involves a modification to an NPDES permit which does not involve application, for which EPA does not intend to issue public notice, the department will require a copy of the proposed modification at least 60 days before any deadline established by EPA for certification action on the modification, or 60 days before the proposed effective date of the modification, whichever is the sooner. All supplementary forms or other information pertaining to the application must be served on the central office of the department at the time of their filing with EPA.

(b) Within 30 days after receipt of an application for certification, the department will, if

necessary, serve notice upon the applicant that additional information is necessary in order for the department to determine whether the discharge will comply with the applicable provisions of secs. 301, 302, 303, 306 and 307 of the FWPCA [Federal Water Pollution Control Act], and that the additional information must be served upon the department within 30 days after receipt of the request. If the information is not served upon the department within the time period specified, certification will be denied.

18 AAC 15.130. In addition, DEC regulations also provide for public notice and hearings on NPDES permit certifications, as well as specify the timetable and required form for the final certification decision. *See* 18 AAC 15.140–.170.

**11.** Alaska water quality standards apply to individual dischargers, not to industries or groups considered as a whole; 18 AAC 70.010(a) provides that "[n]o person may conduct an operation that causes or contributes to a violation of the water quality standards set by this chapter."

eral executive branch intended to leave these procedures to the states' discretion. Since DEC regulations also do not explicitly mandate case-by-case certification, we reject MAC's contention that DEC is legally obligated to certify draft NPDES permits on an individual rather than group basis.[12]

III. DOES DEC'S IMPOSITION OF A 0.2 ml/l EFFLUENT LIMIT FOR SETTLEABLE SOLIDS ON ALL PLACER MINING OPERATIONS THROUGH DEC'S BLANKET NPDES PERMIT CERTIFICATION CONSTITUTE AN IMPROPERLY PROMULGATED REGULATION?

█ MAC specifies as error the rejection of its contention that the 0.2 ml/l effluent limit for settleable solids which was certified by the State of Alaska for the 1985 NPDES placer mining permits constitutes an illegally promulgated regulation. MAC's contention is that if the 0.2 ml/l effluent limit is a regulation, then it is invalid because the State of Alaska did not comply with the statutory requirements for enactment of a regulation when it adopted this standard.[13]

In our opinion, events since the issuance of the 1985 NPDES permits have rendered this issue moot. As noted earlier in this opinion, see supra note 7, the 539 NPDES permits at issue in this case expired on December 31, 1986. All of the NPDES permits which the EPA issued in 1986, 1987, and 1988 already contained a 0.2 ml/l effluent limit on settleable solids at the time EPA sent the permits in draft form to DEC for certification. DEC certified the three groups of permits with three blanket certifications. As to the NPDES permits which were issued in 1986, 1987, and 1988, DEC simply certified the NPDES permits as proposed by EPA without imposing more stringent conditions than those set out in the draft permits. These certifications by DEC did not constitute the promulgation of de facto regulations.

In regard to the 1985 group certification by DEC, it was DEC, not EPA, which imposed the 0.2 ml/l settleable solids effluent limit on placer miners through its certification of the NPDES permits. DEC made its 1985 NPDES certification contingent on imposition of a more stringent effluent limit on settleable solids than the limit originally proposed by EPA. The Clean Water Act required EPA to incorporate the stricter limits cited by DEC into its final NPDES permits. See 33 U.S.C. § 1341(d). Therefore, the 0.2 ml/l limit was attributable to action by DEC, and this action was arguably regulatory in nature.

---

**12.** In its resolution of this issue the superior court concluded that

there is a reasonable basis for DEC's determination that .2 ml/l will comply with state water quality standards. It was reasonable for DEC to make a blanket determination in light of the economic and practical considerations of making a site-by-site determination. As stated above, if an interest group feels that a specific location will not meet water quality standards with a .2 ml/l effluent limitation, they have the opportunity to present evidence at a hearing and persuade DEC to change the effluent limitation at a particular site.

**13.** The DEC Deciding Officer concluded that the 0.2 ml/l effluent limit for settleable solids which was certified by the State of Alaska was not a regulation. The Deciding Officer reasoned in part that the State had not promulgated a standard of general application. "Rather, the State was involved in a permitting action which pertained to particular 1985 permits for particular miners." The Deciding Officer further stated in his decision

that to require certification actions by the State to comply with the time-consuming procedures for enactment of a regulation would render the certification actions incapable of being performed in a time-frame even approaching that set forth in the EPA and State regulations.

On appeal, the superior court rejected MAC's illegally-promulgated-regulation argument, reasoning in part as follows:

Here as in State v. Northern Bus Co., Inc., 693 P.2d 319, 323 (Alaska 1984), there is a sufficient regulatory scheme to permit DEC to adjudicate all the permits. The .2 ml/l effluent limit is an adjudication rather than legislation. Although the .2 ml/l effluent limit applies to a number of permits, it is an adjudication; an interpretation of existing regulations rather than promulgation of a regulation. Therefore, the Deciding Officer's ruling that the .2 ml/l effluent limit is not a regulation is AFFIRMED.

In contrast to the 1985 NPDES permits, the 0.2 ml/l effluent limit on settleable solids in subsequent permits is attributable to action by EPA. After 1985, the 0.2 ml/l limit was already contained in draft NPDES permits when EPA sent the permits to DEC for certification. States are powerless to alter draft NPDES permits during the certification process, except to make permit conditions more stringent. *See* 33 U.S.C. § 1341(d); 40 C.F.R. § 124.55(c). If a state does nothing, it waives certification, and the NPDES permits are issued as originally proposed by EPA. *See* 40 C.F.R. § 124.53(c)(3). Therefore, DEC effectively had nothing to do with imposing the 0.2 ml/l limit on placer mining operations after its 1985 certification, even though it continued to certify NPDES permits containing the 0.2 ml/l limit on a group basis. MAC's claim that DEC violated Alaska's Administrative Procedure Act, AS 44.62.010–44.62.650, when it adopted a *de facto* regulation by imposing the 0.2 ml/l limit on placer miners is thus moot; while the 0.2 ml/l limit currently remains in effect, the agency responsible for this limit is now EPA rather than DEC. EPA is not subject to the requirements of Alaska's Administrative Procedure Act.

## IV. DO THE CONDITIONS OF DEC'S CERTIFICATION ASSURE COMPLIANCE WITH ALASKA'S WATER QUALITY STANDARD FOR SETTLEABLE SOLIDS?

As noted previously, Alaska's in-stream settleable solids water quality standard requires no measureable increase in settleable solids above natural background conditions.[14] The record establishes that standard measuring techniques can detect settleable solids concentrations down to approximately 0.1 ml/l.

**14.** 18 AAC 70.020(b) (Water Quality Parameter (7)) ("[n]o increase in concentration of sediment, including settleable solids, above natural conditions").

**15.** TFA not only seeks invalidation of the 0.2 ml/l effluent limit, but also requests this court to order DEC to modify its certification, with prompt notice of the modification to EPA and all 536 miners, to incorporate an effluent limitation of 0.1 ml/l for settleable solids.

TFA and NAEC argue that DEC violated federal and state law by certifying the 539 draft NPDES permits for placer mines when some of the mines will violate state water quality standards even assuming they strictly comply with all the conditions and limitations of the permits. Specifically, TFA and NAEC maintain that the 0.2 ml/l effluent limit for settleable solids incorporated into each permit as a result of the certification process does not in all cases ensure that placer mine operations "will comply" with Alaska water quality standards.[15] The state disagrees; it maintains that the 0.2 ml/l limit provides "reasonable assurance" of compliance. MAC, on the other hand, argues that the 0.2 ml/l effluent limit is too stringent a standard.[16]

In regard to this issue, the Deciding Officer made the following relevant findings of fact:

17. The minimum detectable level for settleable solids using the Imhoff cone test is approximately .1 ml/l.

18. Virtually all placer miners who treat their effluent utilize settling ponds as the main treatment method.

19. To meet the permit's instantaneous maximum settleable solids effluent limitation of .2 ml/l, miners must, at a minimum, use properly designed, constructed and maintained settling ponds.

20. Properly designed, constructed and maintained settling ponds will generally produce effluent with settleable solids concentrations of less than or equal to .1 ml/l. Properly designed, constructed and maintained settling ponds will result in in-stream settleable solids concentrations of less than .1 ml/l.

21. Placer miners who meet the instantaneous maximum of .2 ml/l settlea-

**16.** In part, MAC asks this court to void the 0.2 ml/l effluent limit for settleable solids and to hold that the original 0.7/1.5 ml/l effluent limit for settleable solids shall remain the enforceable figure until such time as DEC obtains the requisite information and properly certifies further NPDES permits.

ble solids effluent limit will have in-stream settleable solids levels of less than .1 ml/l.

22. The draft permit's excess water bypass and out-of-stream settling pond requirements result in reduced water us-age, increased treatment efficiency and increased amount of fresh water avail-able for in-stream dilution, thereby in-creasing the assurance that the mining operation will meet state water quality standards.

23. The instantaneous maximum of .2 ml/l settleable solids effluent limit is close to the minimum detectable level for settleable solids. If one takes into ac-count that this is an instantaneous maxi-mum and if one makes an allowance for stream water dilution and infiltration di-lution, the resultant in-stream settleable solids increase will be below the .1 ml/l minimum detectable limit.

24. Dilution ratios of effluent to re-ceiving water of 1:1 to 1:9 are typical for Alaska placer mining operations.

25. It is reasonable to assume that there will be fresh water surface infiltra-tion and fresh water subsurface infiltra-tion prior to the discharge of the effluent from a settling pond into a stream.

In his conclusions of law pertaining to this issue of the reasonableness of the 0.2 ml/l effluent limit on settleable solids, the Deciding Officer stated:

An argument has been made that an effluent limitation of .2 ml/l for settlea-ble solids will not provide reasonable as-surance of compliance with water quality standards. The Deciding Officer does not think that any requestor has sus-tained its burden of proof on this issue, and consequently this argument is reject-ed.

The evidence indicates that, to meet the permit's .2 ml/l limit, a miner must use a properly designed, constructed and maintained settling pond. The evidence also indicates that such a settling pond will produce effluent with settleable sol-ids concentrations of .1 ml/l or less. Furthermore, a placer miner who meets the .2 ml/l settleable solids effluent limit will have in-stream settleable solids lev-

els of less than .1 ml/l, which is the minimum detectable limit. Such a level of settleable solids clearly satisfies the state water quality standard of "no mea-surable increase."

The .2 ml/l effluent limitation is very close to the minimum detectable level for settleable solids. If one takes into ac-count the excess water bypass provision in the draft permit as well as the out-of-stream settling pond requirement, the .2 ml/l limitation is a reasonable limitation. If one further takes into account in-stream dilution and increased treatment efficiency, the .2 ml/l limitation becomes even more reasonable as a limitation which will assure compliance with water quality standards.

One can make additional observations about the appropriateness of the .2 ml/l limitation. There will be some infiltra-tion dilution in placer mining operations. Furthermore, the .2 ml/l limitation is an instantaneous maximum. That is, the effluent can never exceed .2 ml/l at any time during the operation of a mining site. It is reasonable to assume that the effluent quality for settleable solids will generally be below .2 ml/l rather than right at .2 ml/l.

When these assumptions are made, and the evidence presented at the hear-ing indicates that these assumptions are in fact reasonable ones, the .2 ml/l ef-fluent limitation for settleable solids clearly is a reasonable one. The evi-dence indicates that DEC is able to say with confidence that such a limitation will reasonably assure compliance with water quality standards.

TFA has argued that if one does not do a site-specific verification for settleable solids in effluent, then only an effluent limit of .1 ml/l will assure compliance with water quality standards. The as-sumptions underlying such an approach are not reasonable. While .1 ml/l will by definition assure that in every case there is no measurable increase in settleable solids concentrations above natural back-ground, it is not necessary for the limita-tion to be that low to reasonably assure no measurable increase. TFA's argu-ment assumes a worst case scenario in

every case and ignores some reasonable assumptions about dilution, pond performance, and instantaneous maximums. The evidence presented at the hearing indicates that TFA's argument is not correct when applied to the real world and actual mining sites.

Dilution, instantaneous maximum considerations, actual performance of settling ponds—all these factors help to insure that the .2 ml/l limitation will assure compliance with the water quality standards. TFA has argued that if the effluent limitation is not at .1 ml/l or lower, then it is possible under some circumstances that there will be a violation of water quality standards. The Deciding Officer does not interpret the CRA [Certificate of Reasonable Assurance] to mean that DEC has assured that there will never be an incident where a discharge from a placer mining site in the state increases the settleable solids concentrations in a stream. The CRA must be more reasonably interpreted. Can DEC certify that a limitation reasonably assures compliance with state water quality standards? If so, then the test is met. The evidence presented in this case indicates that DEC can satisfy this test with the .2 ml/l limitation.[17]

### A. *Applicable Standards of Review.*

TFA and NAEC maintain that this court should apply the "substantial evidence" standard to determine whether the record supports DEC's finding that a 0.2 ml/l standard for settleable solids will lead to compliance with the state water quality standard. On the other hand, DEC argues that this case involves mixed issues of law and fact, and thus this court should defer to DEC's determination unless it lacks a reasonable basis.

Since the portion of DEC's decision construing statutes and regulations governing water pollution is clearly separable from its factual finding as to whether a 0.2 ml/l settleable solids effluent limit will lead to compliance with Alaska water quality standards, both standards of review are applicable. *See Pan Am. Petroleum Corp. v. Shell Oil Co.,* 455 P.2d 12, 20–23 (Alaska 1969).

In the instant case, the parties also disagree over the standard of certainty required of DEC's NPDES certification under the Clean Water Act and federal and state regulations. This is essentially a legal question of statutory and regulatory interpretation. On such questions, we apply the deferential reasonable basis test. *See id.; Rose v. Commercial Fisheries Entry Comm'n,* 647 P.2d 154, 161 (Alaska 1982). The parties also dispute whether the 0.2 ml/l standard for settleable solids will lead to compliance with state water quality standards. We review such factual questions under the "substantial evidence" test. *See Storrs v. State Medical Bd.,* 664 P.2d 547, 555 (Alaska), *cert. denied,* 464 U.S. 937, 104 S.Ct. 346, 78 L.Ed.2d 312 (1983).

### B. *Does DEC's Interpretation of the Standard of Certainty Required of Its Draft NPDES Permit Certification Have a Reasonable Basis?*

After reviewing the draft NPDES permit EPA intended to issue individually to 539

---

17. On appeal the superior court resolved the issue in the following manner:

The court concludes that there was a reasonable basis for the administrative decision to include .2 ml/l settleable solid effluent limitation and therefore the Deciding Officer's decision upholding the .2 ml/l limitation should be upheld.

As pointed out by DEC, practically and economically it would be impossible in any realistic way to conduct a site-by-site evaluation of each of the 539 placer miners requesting permits. Instead the agency determined that in all cases the .2 ml/l settleable solid effluent limitation would comply with the requirement that there would be no increase in concentrations above natural conditions of settleable solids.

Either or both a permit applicant or an interested group such as TFA may request a hearing on an individual permit and present evidence to persuade DEC that the .2 ml/l limitation is either too restrictive or not restrictive enough. Therefore, any interested party may have a site-specific review of any of the permits so certified.

In light of economic and practical considerations, there is a reasonable basis to have a blanket certification for all 539 permits since any interested party may come in on a site-by-site basis and request a review.

placer miners, DEC certified the permits (on condition that the limit for settleable solids be set at 0.2 ml/l) based on its conclusion that there was "reasonable assurance" that discharges resulting from the permitted activities would comply with, *inter alia,* Alaska water quality standards. TFA and NAEC take issue with the "reasonable assurance" standard, arguing that under the Clean Water Act and DEC regulations, DEC may not certify draft NPDES permits unless the agency assures "strict compliance" with state standards in all cases and at all discharge points.

Exactly how the standard of certainty advocated by TFA and NAEC differs from that employed by DEC is unclear. DEC does not argue that state standards may be exceeded under certain circumstances or at certain discharge points. Apparently, therefore, TFA and NAEC simply argue that DEC must provide something more than "reasonable assurance" of compliance with state water quality standards in its certification.

■ Under the "reasonable basis" test, this court will not lightly interfere with an administrative agency's interpretation of statutes and regulations which bear on discretionary determinations within the agency's area of expertise. *See, e.g., Rose,* 647 P.2d at 161. Here, DEC has authority to certify draft NPDES permits if it determines that the permits meet statutory and regulatory requirements.

■ We conclude that DEC's interpretation of the degree of certainty required of its certification under the Clean Water Act, as well as under federal and state regulations, has a reasonable basis. TFA and NAEC emphasize language in the Clean Water Act which requires states to certify that NPDES permittees "will comply" with state standards, as well as a DEC regulation which prohibits violations of Alaska water quality standards. *See* 33 U.S.C. § 1341(a)(1); 18 AAC 70.010(a). These provisions, however, do not necessarily require DEC to provide absolute certainty that permittees will never violate state standards, assuming this sort of guarantee is even possible. Moreover, DEC applied a "rea-

sonable assurance" standard in accord with federal regulations implementing the Clean Water Act, which provide that states must include within a draft NPDES certification "[a] statement that there is a *reasonable assurance* that the activity will be conducted in a manner which will not violate applicable water quality standards." 40 C.F.R. § 121.2(a)(3) (emphasis added).

C. *Does the Record Contain Substantial Evidence to Support DEC's Finding That a Settleable Solids Effluent Limit of 0.2 ml/l Provides Reasonable Assurance That All Permittees Will Comply with State Water Quality Standards?*

■■ Randolph Bayliss, chief of DEC's Water Quality Management Section, described in an affidavit how DEC arrived at the 0.2 ml/l effluent limit for settleable solids applicable to placer mining operations:

The certified permit condition (in this case, 0.2 ml/l settleable solids) applies to the discharge of placer mining waste *prior* to entry into and dilution by the receiving waters. The Water Quality Standard (in this case, no measurable increase in sediment) applies in the receiving waters after dilution in a mixing zone. The enforcement procedure would go like this: measure the settleable solids in the receiving waters upstream of a placer mining discharge, then measure the settleable solids a reasonable distance downstream of the placer mine discharge, say 500 feet. If there is a measurable increase, there would be a violation of the Water Quality Standards. This applies only to manmade increases above natural conditions, but in even the most heavily naturally silted rivers of Alaska, there are few with measurable settleable solids.

Therefore,

1. with 0.1 ml/l being the lowest detectable gradation in the testing procedure, and

2. with a reasonable amount of dilution, there is a reasonable assurance that 0.2 ml/l in the discharge would not be

measurable after mixing in the receiving waters, and, with that added condition, the permits could be certified as being in compliance for the Water Quality Standards for sediment.

(Emphasis and parentheticals in original.)

To support the 0.2 ml/l settleable solids limit, DEC maintains in its brief that "[i]f one makes some reasonable allowance for in-stream dilution of the .2 ml/l effluent prior to the in-stream measurement, the resultant water quality will ... approach, if not fall below, the .1 ml/l minimum detectable settleable solids level." DEC asserts that this holds true regardless of any site-specific differences. The agency also argues that in order to consistently meet the 0.2 ml/l effluent limit for settleable solids, placer miners must install settling ponds. It further contends that properly constructed settling ponds will usually produce effluent which will contain settleable solid concentrations at or below 0.1 ml/l, even before dilution by the receiving stream. Finally, DEC asserts that "infiltration dilution" by groundwater, and requirements within the NPDES permits for excess water bypasses and out-of-stream settling ponds, provide further assurance that placer mining operations will not violate the state standard for settleable solids.

When reviewing an agency's factual findings, we review the whole record to determine whether the agency's findings "are supported by substantial evidence, i.e., such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Galt v. Stanton*, 591 P.2d

960, 963 (Alaska 1979) (quoting *Keiner v. City of Anchorage*, 378 P.2d 406, 411 (Alaska 1963)). In this case, we hold that the record does not support DEC's finding that the 0.2 ml/l effluent limit for settleable solids provides reasonable assurance that all 539 NPDES permittees will meet state water quality standards.

DEC's finding that the 0.2 ml/l settleable solids limit will lead to compliance with water quality standards is largely predicated on an assumption that effluent from placer mines will undergo "a reasonable amount of dilution" by receiving streams.[18] However, DEC Water Quality Section Chief Bayliss testified that an unspecified number of the permittees covered by DEC's blanket certification utilize most or all of the flow of a stream in their operations.[19] If a miner uses most or all of the stream in his or her operations, the record indicates that the water quality of effluent from the mine will very closely approximate the water quality of the stream below the mine because the effluent and the stream are essentially the same.[20] Therefore, if a mine's effluent contains 0.2 ml/l of settleable solids, the maximum concentration allowed by the NPDES permits as certified by DEC, the stream below the mine will also contain roughly 0.2 ml/l of this pollutant. This substantially exceeds the water quality standard for settleable solids. The record therefore does not contain substantial evidence to support DEC's finding that reasonable dilution of placer mine effluent will enable all permittees to

---

**18.** In its brief, TFA alludes to the fact that "[b]oth EPA and DEC regulations allow some consideration of stream mixing in determining whether a discharge from a particular site results in violations of water quality standards." *See* 18 AAC 70.032; 40 C.F.R. § 131.13. TFA also states in its brief: "While not conceding that the use of mixing zones is legal, we do not raise this argument here."

As TFA analyzes this issue, the question to be answered is whether all streams that receive placer mining discharges have sufficient flow to enable compliance with water quality standards.

**19.** Bayliss also testified that using the entire stream in placer mining operations was "not typical," although he did not know how many permittees used the entire stream.

**20.** TFA argues that "[i]f a miner uses all of a stream for his mining operation, then the quality downstream will equal the quality of the discharge."

DEC asserts that the use of well-maintained settling ponds installed according to DEC guidelines will ensure that permittees will comply with the settleable solids effluent limits. However, the draft NPDES permits as certified do not require permittees to use settling ponds; rather, the permits simply prohibit a permittee who decides to construct a settling pond from constructing it within a stream. Nor are the DEC settling pond guidelines (contained in a DEC publication entitled *Placer Mining Settling Pond Design Handbook* (1983)) mandatory.

comply with the state water quality standard for settleable solids when the effluent limit is 0.2 ml/l. On the contrary, the record indicates that an undetermined number of miners will likely violate Alaska's settleable solids standard, even if they fully comply with the 0.2 ml/l effluent limit.

In short, TFA has met its burden of production and persuasion as to those permit holders who utilize most or all of the flow of the streams in which their mining operations take place. *See* 18 AAC 15.-270(c) (burden on party requesting hearing). As to such a permit holder, DEC's certification is invalid since it will not assure compliance with Alaska's water quality standards.[21]

On the other hand, as to those permit holders whose placer mining operations do not utilize most or all of the flow of the streams used in their mining operations, we hold that the record contains substantial evidence to support the Deciding Officer's thorough findings and conclusions that reasonable dilution and other relevant factors affecting the placer mines' effluent will assure compliance by permittees with Alaska's water quality standard of 0.2 ml/l for settleable solids.[22]

## V. CONCLUSION.

The superior court's affirmance of the Deciding Officer's decision sustaining DEC's certification is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent with this opinion.

Upon remand DEC shall take steps to identify those permit holders, if any, whose placer mining operations utilize most or all of a stream's flow in the course of their respective mining operations. As to any such permit holders, DEC shall take appropriate steps to withdraw its certification and vacate the permit.

---

21. Our task here is to ascertain whether the NPDES permits as certified meet state water quality standards for settleable solids. The foundation of our ruling is that the NPDES permit holders in question use most or the entire water flow, and that under the permits as certified there is no requirement that permittees use well-designed and properly constructed (in accordance with DEC guidelines) settling ponds in their operations.

22. We have reviewed all of the remaining specifications of errors which have been advanced by TFA, NAEC, and MAC and have concluded that they are without merit.