Don STEIN, Glenn Bouton, Lela Bouton, Kenneth H. Manning, Stanley C. Rybachek, and Rosalie A. Rybachek, Appellants,

v.

Dennis KELSO, Alaska Department of Environmental Conservation, Appellees.

No. S–4247.

Supreme Court of Alaska.

Feb. 5, 1993.

---

**124**

Donald Stein, pro se, Fairbanks.

Glenn & Lela Bouton, pro se, Fairbanks.

Kenneth H. Manning, pro se, Fairbanks.

Stanley & Rosalie Rybachek, pro se, North Pole.

John A. McDonagh, Asst. Atty. Gen., Fairbanks, Charles E. Cole, Atty. Gen., Juneau, for appellees.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

BURKE, Justice.

This administrative appeal arises out of the Department of Environmental Conservation's ("DEC") certification of two draft National Pollution Discharge Elimination System ("NPDES") permits issued by the Environmental Protection Agency ("EPA"). An independent deciding officer, appointed by DEC to review the certification process, conducted an adjudicatory hearing and approved the certification. Six placer miners appealed the decision, arguing that the limited scope of the hearing deprived them of a property interest without just compensation or due process of law. The superior court determined that no constitutional violations had occurred and affirmed the deciding officer's ruling. We also affirm.

## I. BACKGROUND AND PRIOR PROCEEDINGS

Under the Clean Water Act,[1] any person wishing to discharge pollutants into the waters of the United States must first obtain a NPDES permit from EPA. We outlined the NPDES certification process in *Miners Advocacy Council, Inc. v. State,* 778 P.2d 1126 (Alaska 1989), *cert. denied,* 493 U.S. 1077, 110 S.Ct. 1127, 107 L.Ed.2d 1033 (1990):

> EPA may not issue an NPDES permit unless the resulting discharge will comply with state water quality standards. 33 U.S.C. §§ 1311(b)(1)(C), 1342. Before EPA may issue a permit, it must also provide the state in which the discharge originates with an opportunity to review the draft NPDES permit to determine whether the permit's terms ensure com-

---

1. The Clean Water Act was originally enacted as the Federal Water Pollution Control Act Amendments of 1972, Pub.L. No. 92–500, § 2, 86 Stat. 816 (codified as amended at 33 U.S.C. §§ 1251–1387).

pliance with the state's water quality standards. 33 U.S.C. § 1341(a), (d). A state then has three options. It may deny certification of the NPDES permit, thereby precluding EPA from issuing the permit. 33 U.S.C. § 1341(a)(1). The state may waive certification, thereby removing itself from the permitting process. *Id.* Finally, the state may certify the draft permit, and may include in its certification any conditions more stringent than those in the draft permit which the state determines are necessary to comply with state or federal water quality standards. 33 U.S.C. § 1341(a)(2). EPA must incorporate more stringent conditions suggested by a state into the final NPDES permit. *Id.*

778 P.2d at 1129 (footnotes omitted).

In February 1987 EPA sent a single NPDES draft permit to the state for certification. EPA proposed to issue the permit to 368 placer miner applicants.[2] EPA sent a second draft permit for certification in April 1987 intended to cover an additional 50 placer miner applicants. Both permits contained settleable solids effluent limits of 0.2 ml/l. In other words, miners receiving these permits are prohibited from discharging wastewater from their mining operations containing pollutant concentrations greater than 0.2 ml/l. *See generally Miners Advocacy Council,* 778 P.2d at 1129 & nn. 4–5.

DEC certified both permits and sent EPA Certificates of Reasonable Assurance. Both permits were certified without change because DEC was "reasonably assured" that the permits, as drafted by the EPA, complied with Alaska's water quality standards. *See, e.g., Miners Advocacy Council,* 778 P.2d at 1135–40.

Following the certification, individual miners, mining industry representatives and an environmental organization requested an adjudicatory hearing to review the DEC certifications. The DEC appointed attorney Mark Ashburn to serve as the independent deciding officer. The miners

were concerned that the effluent limits contained in the NPDES permits were too stringent while the environmental group wanted even more stringent limits. The individual miners involved in this appeal also attempted to assert what amounted to an inverse condemnation claim, arguing that the effluent limits were so strict that they were being deprived of a property interest without just compensation or due process of law.

On a motion by DEC, Ashburn agreed to limit the hearing's scope to two inquiries relevant to the certification process: 1) whether DEC followed appropriate procedures in conducting the 1987 certification; and 2) whether DEC properly determined that the terms of EPA's draft permit reasonably assured compliance with state water quality standards. This ruling effectively denied the miners an opportunity to pursue their takings claims within the context of a certification appeal. The miners were also precluded from presenting evidence of the certification's detrimental impact on their livelihood because the deciding officer concluded that such individual concerns had no bearing on whether the NPDES permits reasonably assured compliance with state water quality standards.

Following the hearing, Ashburn upheld DEC's certification of the 1987 draft NPDES permits. Certain individual miners appealed Ashburn's decision to the superior court, which again upheld the DEC's certification. The superior court awarded the state $3600 in attorneys' fees after ruling that the miners did not qualify as public interest litigants. The miners now appeal to this court.

## II. DISCUSSION

### A. *DECIDING OFFICER ASHBURN'S CONDUCT OF THE HEARING DID NOT DEPRIVE THE MINERS OF PROCEDURAL DUE PROCESS.*

The miners argue that deciding officer Ashburn's decision to limit the scope of the

---

**2.** In *Miners Advocacy Council,* we rejected a challenge to such group or "blanket" certifications holding that "[i]n the absence of any statutory or regulatory requirement that DEC certify draft NPDES permits on an individual basis, we conclude that DEC may issue a blanket certification for draft NPDES permits covering a number of permittees, provided the certification ensures that Alaska water quality standards will be met." *Id.* at 1133.

adjudicatory hearing deprived them of a meaningful opportunity to be heard on a matter which adversely affected their livelihood. They cite Ashburn's refusal to hear argument on the loss of their water rights and his decision not to require certain state employees to testify.

The deciding officer in an administrative hearing has the responsibility to conduct a trial-like adjudication in a fair manner and to make decisions needed to expedite the adjudication, including regulating the conduct of discovery and ruling on the admission and exclusion of evidence. *See* AS 44.62.450; AS 44.62.630. The deciding officer's functions and responsibilities are analogous to those of a trial judge, and the deciding officer's decisions to admit or exclude evidence are, therefore, reviewable for an abuse of discretion. *Hutchins v. Schwartz*, 724 P.2d 1194, 1197 (Alaska 1986). However, the "determination whether a state action or procedure violates the due process protections of the state and federal constitutions is a question of law, and we review the matter using our independent judgment." *Carvalho v. Carvalho*, 838 P.2d 259, 261 n. 4 (Alaska 1992).

In *Carvalho*, we stated that:

procedural due process under the state constitution requires 'notice and opportunity for hearing appropriate to the nature of the case.' ... [T]he due process clause of the federal constitution requires that every person

'shall have the protections of [a] day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after a trial....' More specifically, due process requires notice and an opportunity to be heard prior to the deprivation of a property interest protected by the fourteenth amendment.

*Id.* at 262 (citations and footnote omitted) (quoting in part *Johnson v. Johnson*, 544 P.2d 65 (Alaska 1975)).

Applying these well-established principles to the present case, it becomes apparent that the miners' due process argument is flawed because it is based on a misunderstanding of the NPDES permit certification process.[3] When certifying a NPDES draft permit, the state is authorized by federal regulation to add conditions which are more stringent than those contained in the draft permit. 40 C.F.R. § 124.53(e)(2) (1991). The state is also allowed to note in its certification whether the EPA could lower any limits and remain within state law.[4] 40 C.F.R. § 124.53(e)(3) (1991). However, federal regulations prohibit the state from conditioning or denying certification on the grounds that state law authorizes less stringent conditions than those contained in the EPA draft permit. 40 C.F.R. § 124.55(c) (1991).

In this case, DEC certified the draft permits without adding any new conditions. DEC did this because the EPA's draft permits had already incorporated an effluent limit of 0.2 ml/l which DEC had previously determined was the maximum limit permissible in order to provide "reasonable assurances" that all permit users comply with state water quality standards. *See Miners Advocacy Council*, 778 P.2d at 1130 n. 7. The miners sought review of the DEC certifications because they wanted to loosen the effluent limits so that they could discharge wastewater containing a higher concentration of pollutants. The miners evidently refused to accept the fact that DEC was powerless to loosen the effluent limits set out in the draft permits. Nonetheless, the law is clear on this matter, and deciding

**3.** Many of the miners' arguments are based on the misapplication of state and federal regulations and statutes as well as misstatements of our prior case law, particularly our holdings in *Miners Advocacy Council. See Miners Advocacy Council*, 778 P.2d at 1133–40. These arguments are so clearly frivolous that we will not analyze them in detail. Suffice it to say that nothing in *Miners Advocacy Council* supports the miners'

contention that DEC must consider individual socio-economic factors in making its certification decisions.

**4.** However, contrary to the miners' argument on appeal, the regulation does not *require* the state to inform EPA of conditions that can be made less stringent without violating state water quality standards. *See* 40 C.F.R. § 124.53(e)(3).

officer Ashburn had no authority to order DEC to provide the relief the miners requested. Thus, it was well within Ashburn's discretion to limit the scope of the hearing to only those matters upon which he could provide effective relief.

Furthermore, as DEC points out, Ashburn allowed the miners who appeared at the hearing to present all of the testimony they were prepared to present, despite their failure to comply with certain pre-hearing orders concerning witness lists and other procedural matters. The record is clear therefore that the miners were provided with a meaningful opportunity to be heard on those matters which were properly before the deciding officer.[5]

### B. *THE SUPERIOR COURT DID NOT ERR IN AWARDING ATTORNEY'S FEES TO THE STATE.*

The superior court awarded $3600 in attorney's fees to the state as the prevailing party on appeal. *See* Appellate Rule 508(e). The miners argue that these fees were wrongly awarded because they should be considered public interest litigants.

■ We apply an abuse of discretion standard "in reviewing a trial court's finding that a litigant has a public interest status" for attorney's fee purposes. *Anchorage Daily News v. Anchorage School District*, 803 P.2d 402, 404 n. 2 (Alaska 1990) (quoting *Citizens for the Preservation of the Kenai River, Inc. v. Sheffield*, 758 P.2d 624, 626 (Alaska 1988)).

In *Anchorage Daily News*, we listed four criteria to be used in identifying public interest litigants:

(1) Is the case designed to effectuate strong public policies?

(2) If the plaintiff succeeds will numerous people receive benefits from the lawsuit?

(3) Can only a private party have been expected to bring the suit?

(4) Would the purported public interest litigant have sufficient economic mo-

tive to file suit ·even if the action involved only narrow issues lacking general importance?

*Anchorage Daily News*, 803 P.2d at 404.

■ The miners claim that they satisfy all four of these criteria. Notably, they claim their appeal effectuates the strong public policy of ensuring due process and guarding against an agency's abuse of discretion. However, the state correctly notes that the relief sought by the miners was personal, not public, in nature. The miners' own pleadings show that they sought a ruling that they had "lost their property rights and must be justly compensated." Although the miners now maintain that they would not receive any direct economic benefit from a favorable decision concerning DEC certification procedures, this assertion is in direct contradiction to their requested relief.

The superior court did not abuse its discretion in ruling that the miners failed to establish public interest litigant status. The superior court's decision, upholding the decision of the deciding officer, is affirmed in full.

AFFIRMED.

■

---

**5.** Both sides argue the merits of the miners' regulatory takings claim. However, we will not address the merits of a claim that is not properly a part of this administrative appeal. Decid-

ing officer Ashburn had no authority to award the miners compensation for the alleged taking and ruled as much in limiting the scope of the hearing.